I would like to reserve two minutes for rebuttal. All right. What's your clock? In my argument, I'd like to focus on the first issue, which is the exclusion of evidence. In this matter, a 1994 appellant escorted, well, actually helped his grandmother, age 91, file an application for eligibility for long-term medical care in a convalescent home. Nine years later, he was indicted for health care fraud based on primarily the, starting with the 1994 application. The Medi-Cal people who came in to testify either had no contact with the grandmother or didn't recall any, although there's something in the record from 1996 indicating a contact where she understood whatever was being communicated in the file. The defense theory was that his participation in this process was non-material in the sense that, as he testified, he thought he was participating in simply getting her transferred in her Medi-Cal treatment from Los Angeles to San Diego and did not know the great consequence of his own participation in helping her fill out this form. So the trial court excluded the following evidence. The rules of Medi-Cal state that if the applicant is competent, the applicant fills out the form. In this case, Rose Dreischfeld was the person who signed, stating she understood what she was doing and signed the form. An appellant signed as her helper. So the rules under Medi-Cal are that if the applicant is competent, they sign the form and helpers are irrelevant. So the defense theory at trial, which the attempt was made to press, was that his participation was irrelevant because Medi-Cal rules say, one, a competent person signed and is responsible for their application. As he said, Rose signed, Rose was competent, she's responsible for the application. And the Court said evidence as to her competency at the time is irrelevant, despite the fact that there were rules saying that if he filled out that information, expecting somebody to rely on it, right? He said that, yes, that when he participated in cross-examination, he said, well, I expect that people would rely on it. And, in fact, people did rely on it. So suppose they were violating the regulations. So what? Well, our point was that nine years later, when this was tried, this evidence would have impeached their testimony that they relied on it. In reality, this was a very routine and ‑‑ Well, if they didn't rely on that, they had nothing else to rely on, because he was the one who was filling out the paper. Oh, no. He filled out the paper, as he said, in which she's participating and saying ‑‑ giving him the information, and she signs as the applicant, stating, I understand what I've done, and I am the applicant. Their rules say that if she's allowed to sign as the applicant, she's presumptively competent, and his participation is ultraviolence. So you're saying his, the fact that he also signed and presented the form and everything else, shouldn't make him responsible to the agency or criminally liable? Correct. Because under their rules ‑‑ What about the next one? That's another thing I'm wondering about. All right. So that's the first one. What about the next one? The next one is the authorized representative. But they redid it every year. They had it be reauthorized every year. Right. And he signed those. And he signed those. So you're only arguing about the first one. Well, that's the basic ‑‑ well, I'm arguing about everything, because his testimony, which ‑‑ But wasn't he ultimately convicted only for the ones at the end? He was convicted on a scheme that was argued as commencing with the 1994 submission. But wasn't he ultimately charged with the 1998 submission? Right, because of statute of limitations. That was he did do by himself. So what's the issue? Well, the issue is that he should not have been ‑‑ he was not designated as a ‑‑ that's the second issue of the exclusion. Under their rules, he has to be designated as the ‑‑ But as to the 1998 ones, as to which he was actually convicted, he's the only one who filled it out, and that's all they could have been relying on. Well, she has to ‑‑ there has to be something in the file indicating that she designated him as the authorized representative. I understand that. But now we're going back to the original point. He filled it out expecting them to rely on it, and they did rely on it. And as to the ones as to which he was actually convicted, there was nothing else they could have been relying on. Well, I disagree with ‑‑ unless I misheard the statement. He filled out the original form, and they did rely on it. This evidence would have impeached the ‑‑ I'm asking about the 1998 forms, which is what he was convicted of. Am I correct that that's what he was convicted of? He was convicted of a scheme that was argued and laid out that went from 1994. But it required the 1998 forms to be relied on. Yes. As to those forms, his grandmother was not confident. She didn't sign anything. Only he signed it. And the only way she could have gotten the money is on his say‑so. Is that so far correct? It's so far so correct that he signed it. That's correct. The first argument of the State Tribunal, of course, is that he was never transferred and made the representation that there had been no transfers of property in the last year. That was truthful. There had been no transfers in the last year. The one that they argued was the deceptive one was that there'd been a transfer of property for his holding. I thought their argument was it was never transferred, it was always hers, and his argument was it was never transferred. It was always mine. No, that – well, for purposes of the 90s, yes, but he was saying as of the 80s. That's all that matters. So the 30-day period doesn't make any difference, or when it was transferred. It just doesn't matter. You're really confusing me in the way you're arguing. Okay. Let's go to the last issue of exclusion, which I think is simpler, and that is his mental state as to whether he believed he owned this property. Yeah, but that's the other part. I mean, this whole thing is confusing because I still cannot say, you know, and I know for sure whether she actually moved to San Diego into a convalescent home because all the testimony goes back and forth, back and forth. But on this one, how could he have possibly thought that the condo was always his when, in 1994, right before the condo – right before he filled out this form with Rose, there was a grantee which transferred it to a third party that had listed Rose as the grantor? With him as the power attorney to effectuate that, yes. Right, but it's – I mean, it's exactly contrary to that. If he had owned that property, why wouldn't he have been the grantor? He was not on title. He said that the family had conveyed that to him. It didn't do it in the legal sense of going down to a recorder and giving it to him, but it was his property, that the property was communal property. Can you transfer property that way? Well, this goes to his mental state as to whether he's being deceptive and she's being deceptive when they say that the property had been – the question was on question 28, was there a transfer of property in the last 30 months. And he was saying in the 80s, this property was mine. And he – and that evidence was excluded. Now, what – Isn't the main evidence that he was being deceptive is that when he was originally asked about all this, he said that she was still in Los Angeles. She never – she never sold the house. She never went to San Diego, et cetera, et cetera. Well, that was in a 2002 interview with the IRS agent, which he disputed. So – Right. But there was a trial, and apparently somebody didn't believe him, believe them. Well, that's true. And I'm not arguing insufficiency evidence. I'm arguing the right to put on a defense, and part of that defense was his mental state as to when he filled out the form in 1994, he had been, as he said, told that he was the owner of this property and that he had a police officer ready to come in who was his partner for several years in Los Angeles who knew about the relationship with his grandmother, and that evidence was excluded. But that's really strange because at least the proffer was not that that guy was going to say that he was – that he told him that it was his condo. The proffer was something really weirdly worded about I developed the impression that or I came to understand that or something like that. The proffer was that it was a prior consistent statement. I understand, but the actual statement was a very – there really wasn't a statement about a statement. There was a statement about what the witness came to understand, not what anybody actually said to him. Right, but I think in the proffer, Appellant's counsel said he came to understand that there was conversations with Appellant. I don't think that was in the proffer. That's the problem. I don't think there was any other way to interpret that. The court excluded it. My reaction was they must have written it that way for a reason, and it probably had something to do with the fact that he wasn't going to say that he heard it from the defendant. The court understood the proffer because the court excluded it. As I read the record, he excluded it. He heard it from the grandmother because it was very strangely worded. He did not say it. I believe the wording was on the question, did you come to have the impression that Appellant was the owner of the property from your contacts with Appellant? Now, maybe I'm overstating that, but the record will bear me out. Senator, were you aware? Did you come to have an awareness? Right. Well, he's talking to him as his partner. I think the context was clear, and I think it was made clearer when they have the prior consistent statement of my client. I think the only fair conclusion is that his client, Mr. Gosselin, was saying to the partner, I'm the owner of the property. He's holding himself out as the owner of the property. The judge, I believe, excluded that, not for reasons of inadequacy of the language of the proffer or specificity, but rather because the court felt it was a conclusion about ownership. And, of course, that wasn't what was trying to be conveyed. It was simply his statement that in his mind he was the owner. And, therefore, that would corroborate that he was the owner, that's where the money was, that would corroborate everything that was said in 1994, and it would make all of the statements, including the 1998, truthful, if, because there were no transfers of anything after 1994. I realize what the government's theory is, but this is the defense theory. The offer of proof, which appears on page 33 of her brief, doesn't say anything about conversations with Steve. It says the offer of proof as to Wrangel is that he did develop an awareness as to the ownership of the house. It says nothing about getting it from your client. So that's my problem. Whatever. I would appreciate if you would talk about the prosecutorial discretion. The first prong of that is that in the first thing that counsel for the government, not appellate counsel here today, says is there's a reason Mr. Roque, counsel for the defense, is a very smart guy. And the reason that he only put in one exhibit in this case, and I might add that the first argument was all the evidence that the government successfully excluded that appellate tried to get in, which would have been the Medi-Cal regulations. The reason he only put in one exhibit was because he knows how overwhelming the evidence is that his client is guilty. And that's why he only put that in it. Now, I say that that means to a jury hearing that, that the prosecutor knows or believes and that it is relevant for the jury to know that defense counsel believes his own client is guilty, based on the overwhelming evidence. I cite a whole bunch of cases that a flat-out statement that defense counsel knows his client is guilty is easily misconduct. And the issue here is whether it was plain air for counsel to make that statement, coupled with the other two statements that are red-flagged for the Court having to do with telling the jury that, in effect, counsel had first told one of the witnesses to lie, this is referring to Mr. Abrams, and that the only reason Abrams didn't come in to testify was because he wasn't going to perjure himself. Again, none of that is in evidence, and nor would it be appropriate to make inferences. The government defends that as saying that this was just imagination, that the prosecutor was saying, let us imagine the conversation between Mr. Gossman, the defendant, and this witness, and then proceeds to talk about a imaginary conversation where they're talking about committing perjury, lying to the agents, et cetera. The third prong of the misconduct for the case is that it addressed – that actually is the one piece that I found both somewhat odd and somewhat troublesome. Do you know of any case law addressing similar, very detailed speculation? I mean, this went on for a whole paragraph and imagined a whole subverting a perjury as to which there's absolutely no evidence ever occurred. Well, if it was a flat-out statement that the defendant had a conversation with a witness in which they support – which he was supporting perjury for, for which there was no evidence, that's misconduct. The issue as to whether it can be prophylactically protected as fair argument by saying, let's imagine this conversation between them. I don't have a case that is on all fours to attempting to sidestep a misconduct by saying, I know that they had this conversation, but you can imagine that the reason that he didn't testify is that this conversation took place. You can imagine it. Well, he's telling them to think outside of the evidence as to a conversation that is not in evidence. What is the relevance of having that imaginary conversation about evidence that didn't take place, and it has to do with subordination of – attempted subordination of perjury? Counsel, you were not the trial counsel. No. Because the hurdle on this issue, I think, is the fact that we have to do plain error review. And the trial counsel didn't object to this line of argument. Correct. All right. So I think the error is plain, and that's the first two hurdles of Olano and Rule 52. Did it substantially injure appellant's rights to have the prosecutor say that his counsel knows he's guilty, in effect, and that the client was in effect suborning perjury? That sounds like it affects substantial rights and goes to the fairness, integrity of the process, and the public reputation of the courts. Finally, the third prong of that is interrelated, too, because in the record is a disciplinary investigation of appellants that took place in 1997 on, I think it was, 12 grounds. He was exonerated on 11 of them. I believe the finding on the 12th was that he didn't have a control plan for the search of a motel room. The thrust of the questions that the prosecutor was putting at the defendant in the cross-examination was trying to go back to that 1997 incident over objection, repeated objection, repeatedly sustained. I think there were four objections sustained before they had the sidebar, and then the counsel for the government says, I need some direction, and the court indicated that he had been sustaining appellant's objections, whereupon they go back out and he starts asking the same line of questions again. The import of those questions was that he had done some misconduct in the investigation on search of a motel room, and that the thrust of the questions he was trying to blame during the investigation, he was trying to blame another officer, when, in fact, as I point out in the reply brief, he took responsibility for approving the search of the motel room. So the thrust of the questions was false, that he had been attempting to basically extrude. Kagan. Those questions were objected to. They were objected to, and a mistrial motion was made after a number of the objections were sustained at sidebar. So I do think that the accumulation of that misconduct did impugn the integrity of the trial, the first two being plainer. We have a review basis on the third one. Kagan. Did you say you wanted to reserve time at the outside? Oh, yes. I'll reserve the time. Thank you very much. May it please the Court, Mark Rahe for the United States. I'd basically like to address the issues as my opponent brought them up in his speech. First off, about the exclusion of evidence, our position with respect to rules on competence, the exclusion of that evidence of Rose Dreischwald, I believe is fairly straightforward as laid out in our papers. And one of the big cases in this area that the district court himself relied on is Nieder v. United States, where the Supreme Court held unequivocally. Sorry, my voice has not been good this week. The Supreme Court held. Do you want some water? Go ahead. Sorry about that. The Supreme Court held unequivocally that justifiable reliance is no longer an element of modern Federal fraud statutes. In addition to that, we cite a line of authority for the proposition that negligence is no defense to a fraud claim. In this case, what is the gravamen of the charge or of the claim that the defense was trying to make? That Medi-Cal employees did not abide by their many detailed internal regulations. That kind of a claim would seem to run squarely up against this kind of case law. And we would also point out, and I did exhaustive, what I thought was exhaustive research on this matter, I have yet to uncover any case which says that an agency's failure to abide by its own internal regulations is a defense against the charge of criminal fraud. And I believe there are good public policies. Well, I mean, he was making a slightly more subtle argument. It was essentially a materiality argument. And that is, it's not because they didn't rely, but because they didn't abide by their regulations. It's because under the regulations, this isn't what he did wasn't material. And so when he was entitled, as I understand his argument, to argue to the jury that they really actually didn't rely because the regulations say they shouldn't have. So my question, I guess, is what is the evidence that they did rely, even if against their own regulations? Well, I think the only thing that I see feasibly is that there is a signature of Rose Dryschville on that original 1994 application. But I don't think that just because it's there, it doesn't say that that signature somehow renders that entire document invalid. And I think when you look at this, I mean, there's just – I was trying to think about a way to – it's almost like an estoppel-type claim here. I mean, this defendant wanted to get long-term Medi-Cal for his grandmother. He wasn't just a casual observer. Three or four months before he filed that initial application, he went to the trouble to get a power of attorney for her. When that deed was conveyed, he signed as the attorney-in-fact. He is eminently aware of her financial situation. In addition, when he signs that MC-210, that's the statement of facts, the initial one under penalty of perjury, a few days later, he also has a face-to-face interview with the DHS Department of Health Services employee. At that interview, it is just he himself that is present. And I believe it's Ruby Ortiz was the DHS employee. She testified that she went over every single question again. And it states clearly under penalty of perjury that his signature appears on the end of the form. But that's not the only thing. In this case, the defendant also at the same time, he was executing a number of forms. They're called DHS Forms 7068. And in each one of these, the very first sentence says, You have accepted responsibility to act on behalf of Rose Dreischfeld. And, I mean, again, and in this document, it states that you have a duty to provide us with information. And not only that, with each annual redetermination form that came thereafter, that's the MC-262 form, at the very end of that form, I believe it's in all caps, all bold, it says, For people who are accepting responsibility, you realize that any false declarations can subject you to fraud. Why do I bring all this up? Because this defendant, he entered in with his eyes wide open. He got exactly what it was that he wanted, four years of medical care to be provided for his grandmother. And then 10 years later, when it turns around and goes south on him, suddenly he says, throws up his hands and wants the Court to believe, oh, you couldn't have relied on me. The agency couldn't have relied on me. I mean the law. Kagan. I'm correct, am I not, that he was in any event only convicted for the 1998 representation? That is correct. And that's Count 7, it lists the August 1, 1998, redetermination. So why isn't why are we worrying about what was in the earlier documents? Maybe it's an abundance of caution, Your Honor. I mean, as defense counsel pointed out, you know, this case, that was the charge in Count 7, but of course, evidence was presented as to what the scheme was. The scheme started in 1998. I understand that, but he filed in 1998 reaffirming, I mean, affirming that whatever had happened earlier was so, but whether or not he was the one who submitted it earlier, in 1998, he was affirming its reliability. Right. And maybe on that, then I won't give any more, I won't beat a dead horse, then. Can we talk about the proceeds argument? Sure. I understand there's one case that says rent from a concealed asset equals proceeds. But how does the concealed asset itself equal proceeds? I think in this case, Your Honor, I believe the case you're referring to is the Ninth In this case, the proceeds, why is it proceeds? Because at the time of the initial application, he's sitting on hundreds of thousands of dollars of cash in a closet, in a box in his closet. He then, and this was the heart of the fraud, if Medi-Cal had known about this money and the representatives testified, Ruby Ortiz, she was the one who dealt with the initial form, and I believe Dolores Washington dealt with every subsequent annual redetermination, they all said if we had known about this money, Rose Dreisfeld would have been ineligible for care. So concealing these assets went to the heart of the fraud, and then this is money that the defendant then starts secreting into his own cash accounts over a four-year period. Did he get convicted of any of the accounts of money laundering? Yes, of all of them. That's why the proceeds question comes up. Right, so there's 10 accounts of money laundering. I believe 1 through 7 was health care fraud, and then 8 through 17 were money laundering. All right, so there was the 1 item of health care fraud, and then the 10 money laundering. And what was the sentence again? 46 months. 46 months. I believe that was concurrent as to all accounts. All right. You know, the essence of the money laundering thing here, and I know the reason we say it's an issue of first impression is because we couldn't find any case that was decided in this health care fraud context. Right, there's none in the health, the only ones I could find were in the bankruptcy fraud context. So this would be, if we were to agree with you on the proceeds, this might be something we need to publish about. Do you, are you aware of any cases that are out-of-circuit cases on this point? No, in fact, again, you know, in fact, we not only cited the Levine, or did I say Latham case, which is the Ninth Circuit. We relied on two other out-of-circuit. It was always sort of this trinity of bankruptcy fraud. These cases, or in the Ninth Circuit case, Latham, is that what it's called? Yes. Interestingly enough, the concern was with the rent, not with the, in other words, the consequences of the concealment, not with the amount that was actually concealed. And so even that doesn't really quite support you here, because you're not looking you're not regarding as the proceeds something he got with the money that he concealed your account. You're relying on the concealed property itself, which is an odd use of the word proceeds. I understand what you're saying. You're saying if he hadn't concealed the money, he would have had, she would have had to spend it on her own health care, and he wouldn't have had it. That's basically what you're saying. Correct. And, you know, under, I believe it's Cal Health, or not Health and Safety, Welfare and Institution Code, Section 14014, expressly states that once Medi-Cal has spent money on somebody based on a false declaration, that the declarant is then liable, shall be liable for repayment. And so our entire theory here is that this money, but for the fraud, he never would have been able to retain this money. Now, I know that, I believe in the briefs, defense counsel, you know, tries to draw upon the more traditional concepts of money laundering from, let's say, drug transactions, where the underlying, where that kind of transaction, without a doubt, is illegal, but the law is not limited to that. And, in fact, in these three bankruptcy fraud cases that we spoke about, just because the money itself is inherently innocent, for lack of a better phrase, does not prevent it from becoming proceeds. But I'm asking you, in any of those cases, was the money itself regarded as the proceeds rather than something that was done with that money? Some more money that was gotten because of that money. In other words, the rent was you took the money and you invested it and you made more money. So that, just in terms of basic English, sounds like proceeds. But here, he didn't make more money. It's just that money. True. I think there was a case we cited, an Eighth Circuit case, Frank, and that was the arson case, which was in response to the hypothetical posed by the defendant. In that case, that was an individual who had been convicted of arson. There was a fine and restitution payments. And money laundering conviction was upheld in that case. He had an automobile that nobody knew about. He sold it. All he did was receive, I believe, five cashier checks, $3,000 each, $15,000. That was held to be proceeds. I mean, I don't – that was the money. I think maybe that's the closest analogy that I could find. But, I mean, also, just looking at kind of the big picture here, what is the essence of money laundering? It is a transaction separate from an underlying fraud whose whole purpose is designed to conceal the source of that money. And I believe this case, just on those basic principles, fits that bill to a tee. Here, the fraud was the concealment of the money from Medi-Cal. Medi-Cal goes ahead, the taxpayers pay four years of convalescent care at the tax – well, Medi-Cal does at the taxpayer's expense. What if Medi-Cal wants to come investigate this? Where is this money? Let's say they develop suspicions. Well, suddenly the source was legal, or at least as far as we know it was legal. And that's what's disturbing about it. I mean, he's not really concealing the source of the money. He's concealing the fact that he still has the money. Well, but I believe those two can't necessarily be separated, because once he starts those 80 transactions from March 1997 to December 2001, little by little, 3,000 here, 4,000 here, that's all in his name, four or five separate accounts. And, in fact, one of the accounts was a Wells Fargo account, which was his same direct deposit account from his employment. I mean, once money goes in, you know, little bits and pieces over a four-year plan, that money, and I believe the testimony also came out, that the deposit slips, they never said anything on them. This is Grandmother Rose's money that we're putting in here. I mean, you know, it's almost sometimes they say the best way to hide is out in the open, because I know another one of the defense themes in this case was, well, he didn't put it in an offshore account. He didn't make up a false name. So be it, but that's not enough. I wanted to say, by the way, because I didn't, that I thought your brief was really one of the best written briefs I've ever read. And I was just reminded of that, because it was just really obliterate. I appreciate that, Your Honor. Again, though, I just believe that the essence of a money laundering is satisfied here, because it does conceal the source, and it's not just the fact that he has the money. There's no ties to Rose Dryschville, if any investigator were looking to that account. The only other theoretical underpinning, I mean, I don't know if this is valid and caseful or not. That's why I think this issue is interesting. But he did take the proceeds from the sale of the condominium, which were, which was concealed. He put it towards a down payment of another house. On his house, in his name, right? Right. So, I mean, that seems to be a more narrow way of looking. And if you're going to look at a narrow definition of proceeds, that certainly would constitute. That would satisfy that. And I believe also there was testimony about getting a pool, and that there was, you know, a contract with successive payments. That would have been another physical benefit that one could point to. What about the prosecutorial misconduct issues? I did find quite disturbing, this standing up and making up for, you know, a page or so, a conversation that never happened. Your Honor. Or that we have no evidence ever happened. I agree it is maybe somewhat unusual, but I don't know if I would agree completely that there's no evidence of it. And the reason I say is that. No, there's no evidence of the particular conversation. That's true. I mean, you know, that he said this, and then he said that, and then he said. I mean, its detail gave it an aura of convincingness that the imagined language, you know, strewn at the beginning and the end, was unlikely to counter. I mean, most people hearing that were more likely to think, well, they're not allowed to say it actually happened, but it must have happened. Where else would we have gotten all this detail from? Which is sort of my reaction. We must actually know something. And so it's disturbing. Well, Your Honor, there is a certain amount of evidence in the record, though, concerning this individual. His name was David Abrams. The defendant testified by his own words that this individual was like a confidant, a brother, a lifelong friend, somebody that he considered part of his family. And he played an interesting role when the IRS special agents went to interview Mr. Gossman on February 20th of 2002. One of the pieces of information that came out was that Mr. Gossman had loaned Mr. Abrams $60,000 in cash. And then later that night, a little interesting twist, Mr. Gossman phoned back the IRS special agent, I believe his name was Chesnate, to make one correction about that entire interview that happened earlier that day, and who did it concern? David Abrams. He said, actually, no, I made a mistake, it wasn't $60,000, it was $40,000. I understand that all of that suggests that David Abrams was asked to lie earlier and did lie earlier. But there's absolutely no reason to believe that there was a conversation in which Mr. Gossman said, Dave, you know, I asked you for a favorable favor, and you came through and told that story, but it didn't work, I need you to come in and stand and deny that you told the agent that story. You can only imagine Mr. Abrams' reaction. Look, Steve, it's one thing to lie, but I'm not going to get up and take and commit perjury, and it says perjury. You're on your own. Good luck. So essentially, there is the accusation of a specific conversation in which Mr. Gossman suborned perjury. That's different than talking to an FBI agent. It's – I've never seen anything like it in a transcript, and it just – I would like to know why – it seems to me it's certainly prosecutorial misconduct. The question is really whether it meets a plenary standard. And the problem is, and I think that if this was an ineffective assistance of counsel claim on habeas, the failure to object would definitely, in my view, be deficient. And then the question that there's a different prejudice question there, whereas under this standard, we have to meet the Olano issues. Well, you know what I mean. I'll go ahead and assume. I'm not going to – I respectfully disagree that it was misconduct, but I will go ahead and assume for purposes of this argument, whereas the prejudice – now, in that case, though, I think that the record is strong, and I know it was under the first claim in our brief where we talked about the evidence. I mean, in this case, this was a – again, though, I mean, Kajan, I believe that's the Ninth Circuit case that talks about sometimes that the signpost that the prosecutor uses, again, even though there wasn't evidence in the record, he did say we can imagine and we can imagine. I mean, it gave the jury a clear signpost that this wasn't necessarily something. In fact, that this wasn't something that wasn't evidence. Now, against all that, this really was a side detail to this entire trial. This case was about the healthcare fraud. There was voluminous testimony. I mean, I believe that the government had no less than ten separate witnesses. The overwhelming majority of that evidence was devoted to the actual counsel indictment. Establishing the medical fraud, the specifics of the application process, the MC-210, the MC-262, the agents testified you have evidence of consciousness of guilt in the record. When they went and interviewed Mr. Gossman on February 20th, 2002, he told two separate lies. He said that his grandmother had not been in a convalescent home at the time of her death, and that he had sold her property after her death, when the actual grant deeds and all the objective evidence in the record clearly shows that's not true. And another, I think, interesting point, he's telling those agents those lies, and yet there's another interesting individual, I believe his name is Michael James, a cousin, to this individual. The record showed Mr. James knew that Rose Greisfeld was in a convalescent home. The defendant tells him a different lie and says this private care is so expensive, I'm going to use the proceeds from the condo to pay for it. I mean, when you look at those two, it basically shows this defense was very savvy. He knew the right lie to tell in the right situation, and he's giving separate stories. The jury heard all of that, that evidence. But basically saying one more lie wouldn't matter. I'm sorry. Even if he was trying to suborn one more lie, that wouldn't make the difference given the record of how many times he lied. Basically. His credibility, if anything, it was cumulative. I mean, the record already showed that he had been impeached time and time again. And for that reason, I don't necessarily think that it rises to the level of reversible prejudice. Now, as to the other two claims of Prosecutor Misconnick, the first one has been characterized as a claim that the prosecutor said that the defense counsel knows his client is guilty. That's not what was said. It said that the defense counsel is smart. He knows that the evidence is overwhelmingly against his client. And that is directly a comment based on the record, and it was also responsive. I know this Court has a long line of case law about the invited reply doctrine. It never gives carte blanche to respond, you know, one sin doesn't equal out another. But I do believe that those cases still have to be taken into account. In the defense closing, there was a statement, David Abrams, where was he? Basically asking the jury, why didn't the government call him? This comment was made in the context of a direct response to that. And basically, the idea also is that if the evidence was to try to really play on the jury's emotions, I think that kind of a thing came out, too. And so for that reason, I don't believe that the first claim rises to reversible misconduct. And finally, as to the last claim of misconduct, the questions about the 1997 motel room search, just a few points on that, Your Honor. Those questions were all objected to, but the objections were all sustained, so the defendant never had to put an answer out. In addition, that the prosecutor sought sidebar and sought guidance shows that he wasn't acting in bad faith. And I think it's also important that prior to Mr. Gossman taking the stand, there had been a character witness by the name of Spencer Ellis. Similar questions had been asked of him without any objection on this basis. And the last two things, Your Honor, is basically that was at the very beginning of 100 pages' worth of cross-examination. I don't believe those questions consumed more than four or five pages of the record. And finally, the government did not touch that in closing argument. And I know we cited a case in our briefs that that's an important consideration. It was something that were inartful questions at worst. They were tried, they were shot down, and then the prosecutor moved on. So unless this Court has any further questions, we would submit. All right. Thank you, counsel. In my remaining moment or two, I would like to say something about the 1988 filing. That would – if that's the key, then the 30-month rule, which the judge excluded, would be relevant, because if we're going to focus on the filings of 1998, the transfers had clearly taken in 1994. Why wouldn't the 30-month eligibility – I don't understand that. The transfers – there was no evidence of any transfers in 1994 to him. Absolutely. The government concedes that the transfers – that he possessed the money. His position was, I possessed it and I owned it longer ago. But if you take the physical possession, which a jury could have said that he got that, he got it in 1994. Because he took his grandmother's money and he sold the condo and he took the proceeds at that point. Right. And so in 1998, if that's the one we're going to focus on, the transfer for no value would take – That wasn't his defense. That was never his defense. That was excluded. He tried to get that in as a defense, to show the relevance of the 30-month rule. Now, true, it was in the context of the 1994 transaction that he was saying, I got it earlier than that. But it would have been relevant to the 1998 form that was filed in which he said – The reason why that wasn't relevant was that it was never his defense that it was ever transferred to him. Ever. Right? I mean, his original defense was, it was always mine. Well, but he was saying that in the sense that they told me it was mine, in the sense that somebody had to be an owner and had to give it to him, and it was his grandmother. Not 30 – Not 30 months prior to that. Whether it was 30 months prior or less than 30 months prior. But a jury could have taken this evidence and said, in 1994, you got possession of it. That's the date we're going to focus on. But they never heard that in 1998 is the optimal declaration of importance. Thirty months prior to that had long ago lapsed, meaning that she was eligible under the 30-month rule. I don't – on the rule of the proceeds, the bankruptcy – there's one distinction on bankruptcy cases in proceeds and money laundering. When you declare bankruptcy, in effect, you're taking – you're asking for the court's protection to protect your estate, and your estate becomes basically the estate of the bankruptcy trustee. And therefore, if you hold assets from that, you are defrauding the trustee. Filing an application for Medi-Cal benefits has no such impact, and therefore, the analogy that the government has made in the three bankruptcy cases it cites, Latham, Levine, and West, are inapplicable for that reason. As well as the fact, as counsel said, that, well, California has a code section that allows you to sue somebody if you file a false declaration. Okay, fine. You have a civil suit. It doesn't mean that you get to go seize certain property as the government's, as if it were the government's. And I'd finally say, as to the rule on proceeds, is the rule of lenity should come into effect here as to what the rule is that's going to be bringing about a criminal sanction. And they are stretching the bounds for the interpretation of proceeds to be what's included in what the defendant was convicted of in this case. So I'd ask for the Court's consideration in applying this new rule, which the government concedes there is no law on this, that the rule of lenity ought to be applied to cabin the bounds of what proceeds are. All right. Thank you, counsel. U.S. v. Guzman will be submitted. And this session of this Court is adjourned. All rise for the session to adjourn.
judges: Wardlaw,berzon, Fitzgerald